# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**HOWARD R. HARRIS**
      **Plaintiff,**

    **v.**                          **Case No. 20-C-1021**

**KILOLO KIJAKAZI,[1]**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Howard Harris seeks judicial review of the denial of his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff alleged that he could no longer work due to knee, back, neck, and elbow problems, but the Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff remained capable of performing a reduced range of "light" work.

In this action, plaintiff argues that the ALJ (1) erred in determining whether his back impairment qualified as conclusively disabling under the agency's Listing of impairments; (2) failed to properly weigh the opinion of a physical therapist supporting greater limitations; and (3) arbitrarily refused to consider him a person of "advanced age," which would have resulted in a disabled finding under agency guidelines. Plaintiff's first argument requires remand, as the ALJ overlooked significant evidence pertinent to the Listing claim. Plaintiff's remaining arguments, which I discuss for the sake of completeness, lack merit. I first set forth the legal standards governing this action, then summarize the facts and procedural history of the case,

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi is substituted as the defendant in placed of Andrew Saul.

and, finally, address plaintiff's arguments.

## I. LEGAL STANDARDS

**A.    Disability Standard**

To obtain DIB or SSI, the claimant must establish that he is "disabled," i.e., unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).  DIB is payable only if the claimant becomes disabled while in "insured status" based on his previous earnings, while SSI is payable regardless of the claimant's insured status so long as he satisfies a means test.  See St. George v. Berryhill, No. 17-C-1150, 2018 U.S. Dist. LEXIS 145277, at *1 n.1 (E.D. Wis. Aug. 27, 2018); see also Liskowitz v. Astrue, 559 F.3d 736, 740 n.2 (7th Cir. 2009).  The test for determining whether the claimant is disabled is essentially the same under both programs.  See Craft v. Astrue, 539 F.3d 668, 673 n.6 (7th Cir. 2008).

The regulations set forth a five-step, sequential test for determining disability.  See 20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v).  At step one, the ALJ determines whether the claimant is working, i.e., doing "substantial gainful activity."  20 C.F.R. § 404.1520(b).  If not, at step two the ALJ determines whether the claimant suffers from any "severe" physical or mental impairments.  An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).

If the claimant has a severe impairment or impairments, at step three the ALJ  decides whether any of those impairments qualify as conclusively disabling under the agency's Listings.

2

20 C.F.R. § 404.1520(d). "The Listing of Impairments . . . describes for each of the major body systems impairments that [the agency considers] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). "To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment. The claimant bears the burden of proving his condition meets or equals a listed impairment." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999) (internal citations omitted).

If the claimant does not meet or equal a Listing, the ALJ proceeds to step four, determining whether the claimant can, given his residual functional capacity ("RFC"), perform his past relevant work. 20 C.F.R. § 404.1520(f). RFC is the most the claimant can still do, on a regular and continuing basis, despite the physical and mental limitations caused by his impairments. 20 C.F.R. § 404.1545(a)(1).

Finally, if the claimant cannot perform his past work, at step five the ALJ considers whether the claimant can, given his age, education, work experience, and RFC, make the adjustment to other jobs existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g). The claimant bears the burden of presenting evidence at steps one through four, but if he reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The Commissioner may carry this burden either by relying on the Medical-Vocational Guidelines (i.e., the "Grids"), a chart that classifies a person as disabled or not disabled based on his age, education, work experience, and exertional ability,[2] or by

---

[2]For instance, under the "light" exertional rules, a person of "advanced age" (55 or older) with a high school level education and unskilled work experience is deemed disabled. 20

summoning a vocational expert ("VE") to offer opinion testimony on other jobs the claimant can still do despite his limitations.  See, e.g., Martin v. Saul, 950 F.3d 369, 376 (7th Cir. 2020); Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994).  The Grids consider only exertional limitations, so unless the claimant is deemed disabled thereunder based on strength limitations alone, the ALJ may not rely solely on the Grids and must consult a VE if the claimant has significant non-exertional limitations (e.g., mental, sensory, or postural limitations).  See Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); Herron, 19 F.3d at 336-37.

## B.  Standard of Review

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by "substantial evidence," and contains an accurate and logical bridge from the evidence to the conclusions.  Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).  Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (internal quote marks omitted).  The reviewing court may not, under this deferential standard, replace the ALJ's judgment with its own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility.  See L.D.R. v. Berryhill, 920 F.3d 1146, 1152 (7th

---

C.F.R. Pt. 404, Subt. P, App. 2, § 202.04.  However, the same person, if under age 55 ("closely approaching advanced age"), is deemed not disabled.  Id. § 202.13.  The regulations provide that the ALJ should "not apply the age categories mechanically in a borderline situation.  If [the claimant is] within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [the claimant is] disabled, [the ALJ] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the] case."  20 C.F.R. § 404.1563(b); see, e.g., Ross v. Berryhill, 385 F. Supp. 3d 767, 775 (W.D. Wis. 2019) (noting that agency guidance directs the ALJ to consider how close the claimant is to the next higher age category; whether the claimant has a limited education (11th grade or less); whether the claimant's past work was many years ago or was limited to an isolated industry such as forestry, fishing, or mining; and whether the claimant has RFC limitations that adversely affect, but do not significantly erode, his occupational base).

4

Cir. 2019).  But a corollary to this rule is that judicial review is limited to the ALJ's rationales; the court will not uphold an ALJ's decision by giving it different ground to stand upon.  Jeske, 955 F.3d at 587.

## II.  FACTS AND BACKGROUND

### A.    Medical Evidence

Plaintiff alleged that he became disabled following an April 2016 motor vehicle accident, which aggravated his pre-existing back and neck problems.  The agency collected his medical records dating back to 2015.

On February 15, 2015, plaintiff was involved in a motor vehicle accident, sustaining cervical and lumbar sprain/strain injuries, commencing a treatment program with Dr. Benjamin Gozon at the Capitol Rehabilitation Clinic consisting of physical therapy, pain medication, and activity modification.  (Tr. at 479.)  On April 10, plaintiff reported that his symptoms continued to flare up along the neck and back.  On exam, Dr. Gozon noted tender spasms along the bilateral cervical, trapezius, and lumbar paraspinal regions.  Range of motion continued to be moderately to severely compromised in these areas with significant pain and guarding at end range.    Dr. Gozon diagnosed cervical sprain/strain, tension headaches, and lumbar sprain/strain, continuing therapy sessions to the affected areas twice weekly over the next few weeks, continued oxycodone for pain control, and indicated plaintiff should consider trigger point injections if the symptoms persisted.  (Tr. at 475.)

On April 30, 2015, plaintiff reported that his symptoms continued along the neck and back areas.  Dr. Gozon recorded the same exam findings and diagnoses, continued therapy and medications, and provided trigger point injections along the bilateral upper trapezius and

5

bilateral lumbar paraspinal regions. (Tr. at 476.) On May 21, Dr. Gozon noted that same exam findings and diagnoses, continuing therapy and medications. (Tr. at 477.)

On June 10, 2015, plaintiff reported that his symptoms would come and go, with good and bad days. On exam, Dr. Gozon noted some moderate tenderness along the bilateral cervical, trapezius, and lumbar paraspinal regions. Range of motion continued to be moderately deficient in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy and medications, and provided trigger point injections. (Tr. at 478.)

On July 14, 2015, Dr. Gozon discharged plaintiff from his care to the care of plaintiff's primary physician. Dr. Gozon noted that over the course of treatment plaintiff gained steady and consistent improvement. He underwent an unremarkable course of recovery, receiving trigger point injections as a supplement to his therapy treatments. He continued to make further improvement thereafter and received his last therapy treatment on July 7, 2015. On follow-up that day, plaintiff reported significant improvement in his symptoms as compared to his initial visits. He had been taking medications sparingly and going about his activities of normal daily living with minimal problems. On exam, Dr. Gozon noted some mild tenderness and tightness along the bilateral cervical, trapezius, and lumbar paraspinal regions. Range of motion continued to be mildly deficient in these areas with some stiffness and guarding at end range. Dr. Gozon advised plaintiff to taper down medications over the next several weeks and continue a home exercise program for his own benefit and well being. (Tr. at 479.)

On April 20, 2016, plaintiff was involved in another motor vehicle accident, and on May 2, 2016, he went to urgent care complaining of neck and back pain. (Tr. at 440, 442, 484.) On exam, he appeared to be in good state of health, alert and cooperative, able to ambulate around the room. He demonstrated good hip strength, tenderness along the trapezius

6

muscles, no midline tenderness from cervical spine to lumbar spine, decreased range of motion of the lower back secondary to discomfort, and paraspinal muscle tenderness. The doctor diagnosed muscle strain, provided a prescription for Flexeril, and discharged plaintiff from the clinic. (Tr. at 443.)

On May 10, 2016, plaintiff saw Dr. Gozon regarding neck and back pain related to the April 20, 2016 car accident. Plaintiff reported that he was a restrained front seat passenger in a moving vehicle which experienced a sudden tire blow-out sending the vehicle crashing into the curb. Plaintiff noted that his symptoms had been quite persistent, with his neck and low back quite sore and tender. Symptoms worsened with range of motion, movement, activity, and ambulation. He also reported difficulty sleeping. (Tr. at 484.) On exam, he appeared in no distress, with tender spasms along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. (Tr. at 484-85.) Range of motion was severely compromised along the neck and back with significant pain, stiffness, and guarding at end range. Sitting root sign and straight leg raise tests were negative.[3] Plaintiff was able to do a half squat with no support but with referred discomfort along the low back. Neurologically, manual muscle testing was 5/5,[4] sensory exam was intact, and deep tendon reflexes 2/4 and symmetrical over both upper and

_____

[3]The straight leg raise test is used to assess for lumbosacral nerve root irritation in patients with lower back pain. https://www.ncbi.nlm.nih.gov/books/NBK539717/ (last visited August 24, 2021).

[4]Muscle testing, sometimes called motor testing, is graded on a 0 to 5 scale, with 0 representing no muscle activation and 5 muscle activation against the examiner's full resistance, full range of motion. https://www.ncbi.nlm.nih.gov/books/NBK436008/ (last visited August 24, 2021).

7

lower extremities.[5]  Dr. Gozon diagnosed cervical sprain/strain, tension headaches, thoracic sprain/strain, and lumbar sprain/strain.  He started plaintiff on a therapy program, "cautioned against heavy lifting activities and recommended off of work over the next three weeks," and started plaintiff on oxycodone for pain control and Flexeril for control of muscle spasms.  (Tr. at 485.)

On May 31, 2016, plaintiff reported that his symptoms were unchanged; he had been tolerating his therapy sessions thus far.  Exam was relatively unchanged, with significant tenderness and spasms along the bilateral cervical, trapezius, and lumbar paraspinal regions.  Range of motion continued to be severely compromised in these areas with significant pain and guarding at end range.  Dr. Gozon continued therapy, kept plaintiff off work for the next three weeks, and continued oxycodone for pain control.  (Tr. at 486.)

On June 21, 2016, plaintiff reported that his symptoms continued to flare up along the neck and back.  Exam revealed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions.  Range of motion continued to be moderately deficient in these areas with significant pain and guarding at end range.  Dr. Gozon again continued therapy, kept plaintiff off work for the next three weeks, continued oxycodone for pain control, and suggested trigger point injections if the symptoms persisted.  (Tr. at 487.)

On July 12, 2016, plaintiff reported that his symptoms continued to come and go along the neck and back.  Exam showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions.  Range of motion was mildly to moderately decreased in these areas with significant pain and guarding at end range.  Dr.

_____

[5]A deep tendon reflex of 2+ is normal.  https://www.ncbi.nlm.nih.gov/books/NBK396/ (last visited August 24, 2021).

8

Gozon continued therapy, kept plaintiff off work for the next four weeks, and continued oxycodone for pain control. (Tr. at 488.)

On August 9, 2016, plaintiff reported that his symptoms continued to flare up along the neck and back. Exam showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions, and range of motion continued to be moderately deficient in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next three weeks, continued oxycodone for pain control, and provided trigger point injections. (Tr. at 489.)

On August 30, 2016, plaintiff reported that his symptoms continued to come and go along the neck and back. The trigger point injections were marginally helpful. Exam showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. Range of motion continued to be moderately deficient in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next three weeks, and continued oxycodone for pain control. (Tr. at 490.)

On September 20, 2016, plaintiff reported that his symptoms continued to flare up along the neck and back, with good and bad days. Exam again showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. Range of motion continued to be moderately deficient in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next three weeks, and continued oxycodone for pain control. (Tr. at 491.)

On October 11, 2016, plaintiff again reported that his symptoms continued to flare up along the neck and back areas. Exam again showed some moderate tenderness and tightness

9

along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. Range of motion continued to be moderately deficient in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next three weeks, continued oxycodone for pain control, and provided trigger point injections along the bilateral paraspinal regions. (Tr. at 492.)

On October 31, 2016, plaintiff reported that his symptoms continued to come and go with some moderate flare ups over the past week. Exam again showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions, with range of motion moderately deficient in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next three weeks, continued oxycodone for pain control, and continued current restrictions. (Tr. at 493.)

On November 22, 2016, plaintiff reported that his symptoms continued to flare up, especially in the low back area. He seemed to have significant discomfort on waking up in the morning and at the end of the day. Exam again showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. Range of motion was moderately to severely compromised in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next three weeks, ordered a lumbar MRI, continued oxycodone for pain control, and continued current restrictions. (Tr. at 494.)

A November 30, 2016, lumbar MRI revealed multi-level degenerative disc disease ranging from mild to severe, most pronounced at L5-S1; disc bulges contacting the L3 and L5 nerve roots; and degenerative disc disease and facet arthropathy causing mild to moderate foraminal narrowing, most pronounced on the right at L3-L4. (Tr. at 462-63.)

10

On December 13, 2016, plaintiff reported that his symptoms continued to flare up over the past few days. Dr. Gozon noted similar exam findings and continued therapy, kept plaintiff off work for the next four weeks, and continued oxycodone for pain control. (Tr. at 495.)

On January 3, 2017, plaintiff reported that his symptoms continued to flare up along the neck and back areas. Exam showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. Range of motion continued to be moderately deficient in these areas with significant pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next few weeks, and continued current medications needed. (Tr. at 496.)

On January 6, 2017, plaintiff established primary care with Dr. Adedapo Okusanya, complaining of fatigue and chest pain. (Tr. at 830.) On exam, motor strength in the upper and lower extremities was normal, and sensory exam was intact. Dr. Okusanya ordered an echocardiogram. (Tr. at 831.)

On January 31, 2017, plaintiff reported to Dr. Gozon that his symptoms continued to flare up over the past week; the symptoms seemed to flare with increasing activity levels. Exam again showed some moderate tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. Range of motion was mildly to moderately decreased in these areas with some pain and guarding at end range. Dr. Gozon continued therapy, kept plaintiff off work for the next few weeks, and continued oxycodone. (Tr. at 497.)

On February 21, 2017, Dr. Gozon discharged plaintiff from his care and supervision. Dr. Gozon noted that over the course of treatment plaintiff gained steady and consistent improvement, receiving his last therapy session on February 16, 2017. On follow-up that day, plaintiff reported significant improvement in his symptoms as compared to his initial visits.

11

"Symptoms have now returned to baseline levels." (Tr. at 498.) On exam, plaintiff displayed some mild tenderness and tightness along the bilateral cervical, trapezius, thoracic, and lumbar paraspinal regions. Range of motion was mildly to moderately decreased in these areas with some stiffness and guarding at end range. Dr. Gozon advised plaintiff to taper down medications over the next few weeks and to follow up with his primary care physician for management of his pre-existing low back pain. (Tr. at 498.)

On June 13, 2017, plaintiff saw Dr. Okusanya with a cough and chest congestion, receiving medications. (Tr. at 556-56.) On June 27, he saw Dr. Okusanya complaining of low back pain. (Tr. at 554.) On exam, Dr. Okusanya noted normal curvature of the spine, bilateral paraspinal tenderness, limited range of motion due to pain, negative straight leg raise test bilaterally, normal bilateral lower extremity motor strength, normal bilateral lower extremity sensory exam, bilaterally symmetrical deep tendon reflexes, and normal gait. (Tr. at 555.) He provided a referral to Advanced Pain Management. (Tr. at 554.)

On July 6, 2017, plaintiff commenced treatment with Dr. Sanjay Sharma at Advanced Pain Management, reporting low back, neck, and left knee pain. He reported that the pain was aggravated by activities, relieved by medication. He had completed a prior course of therapy with mild pain relief. Injections by Dr. Gozon provided no relief; medications provided moderate relief. (Tr. at 519.) On exam, Dr. Sharma noted antalgic gait; tenderness, muscle spasm, and moderately reduced range of motion in the cervical spine; tenderness and muscle spasm in the lumbar spine, with normal lumbar lordosis; tenderness in the hips bilaterally, with moderately reduced range of motion; moderately decreased range of motion in the left elbow, with clicking; and tenderness in the left knee but no swelling. Neurologically, balance and gait were intact; sensory exam revealed loss of sensation to light touch; motor strength was 3/5 in the bilateral

12

quadriceps, bilateral hamstrings, and bilateral gastrocnemius; and deep tendon reflexes were 2+ bilaterally. (Tr. at 521.) Dr. Sharma diagnosed spondylosis of the cervical and lumbar regions, and osteoarthritis of the left knee and left elbow. He recommended physical therapy for neck pain, medications, and, given the failure to conservative measures, diagnostic MBB (medial branch blocks) for performing RFA (radiofrequency ablation). (Tr. at 522.)

On July 11, 2017, plaintiff commenced a course of physical therapy at Alliant Physical Therapy Group, complaining primarily of neck pain. He reported that the pain started in 2015 following a motor vehicle accident in which he was t-boned, getting progressively worse over time. He reported a previous course of therapy, as well as injections which helped for a very short time. He reported difficulty with sleeping, lifting, and reaching due to pain in his neck and shoulder. He indicated he had been laid off from his work with Milwaukee County in the electrical and sanitation department. (Tr. at 611.) The therapist noted limited cervical and shoulder range of motion, with pain, and moderate tenderness to palpation of the cervical paraspinal musculature. (Tr. at 611-12.) The therapist recommended twice weekly sessions for six weeks. (Tr. at 613.) At his second visit on July 14, plaintiff tolerated treatment well, slightly limited with exercises, requiring short breaks due to increased pain during the visit. (Tr. at 614.) On July 18, he reported feeling good for a few hours after his last session. (Tr. at 616.) After four no shows/cancellations, he was discharged from therapy due to non-compliance.[6] (Tr. at 618.) On July 20, plaintiff followed up with Dr. Sharma, his pain unchanged since the last visit. (Tr. at 515.)

On July 25, 2017, plaintiff returned to Dr. Okusanya, with a cough and congestion. (Tr.

_____

[6]The discharge note is dated February 21, 2018, but plaintiff's last treatment date was July 18, 2017. (Tr. at 618.)

at 551.)  On exam, Dr. Okusanya noted no swelling of the elbow and knees, normal motor strength, and intact sensory exam.  (Tr. at 552.)  On July 28, plaintiff saw Dr. Okusanya seeking a new referral for pain management, indicating he was not happy with his current provider. (Tr. at 821.) On exam, motor strength was normal in the upper and lower extremities, and sensory exam was intact.  (Tr. at 822.)

On August 16, 2017, plaintiff commenced treatment with Nosheen Hasan, M.D., at the Center for Pain Management on referral from Dr. Okusanya.  Plaintiff reported low back pain starting about 25 years ago following a long history of working in construction.  He indicated that the pain was exacerbated by a beating he suffered in prison in 1998 and by motor vehicle accidents in 2014 and 2015.  He reported that he could walk about two blocks before the pain became too intense.  He reported that the pain in his neck started after the 1998 incident, worsened by the later accidents.  (Tr. at 562.)  He indicated that he self-discharged from Advanced Pain Management due to being prescribed medication to which he was allergic.  He reported that the injections he received several months ago were helpful.  (Tr. at 563.)  On exam, gait was normal, and he was able to move all extremities.  He displayed tenderness to palpation of the trapezius and lumbar paraspinal muscles; flexion and extension of the cervical and lumbar spines caused increased pain; and straight leg raising was negative bilaterally.  Dr. Hasan assessed low back pain secondary to degenerative disc disease and cervicalgia (Tr. at 565), ordering an MRI of the C-spine and prescribing medications.   They would consider injections in the future.  (Tr. at 566.)

On August 23, 2017, plaintiff commenced a course of physical therapy with Nathanel Sorum, DPT, for low back pain.  He reported injuries to the low back from car accidents in 2016, 2015, and 2014, as well as a physical beating in 1998 when he was incarcerated.  He

14

reported that he had not been able to work for two years and wanted to improve his function. (Tr. at 548.) On exam, lumbar range of motion was 75% flexion, 75% extension, and 50% thoracic rotation, and manual muscle testing of the trunk flexors/extensors and glute max/med was 3/5. (Tr. at 548.) Sorum assessed low back pain due to displacement of intervertebral disc, chronic pain, and myofascial muscle pain. Plaintiff presented with decreased range of motion, strength, and function, as well as severe deconditioning, and would benefit from skilled therapy, with a fair prognosis with compliance. (Tr. at 549.)

On August 28, 2017, plaintiff reported difficulty performing two new home exercises without pain, unsure if he was doing them correctly. (Tr. at 543.) On August 30, plaintiff reported that he was still having some pain with home exercises and needed review on how to do them properly. (Tr. at 789.) On September 6, plaintiff stated that he did not believe his skepticism over whether it was possible for him to improve his symptoms and mobility was related to his treatment outcomes. (Tr. at 539.) He was re-educated on his positive prognosis with therapy but continued to demonstrate psychosocial factors such as fear avoidance and maladaptive pain beliefs and behaviors affecting his overall condition. (Tr. at 540.) On September 8, plaintiff reported that he felt his mobility improve significantly within that day's session. (Tr. at 785.) On September 11, plaintiff reported that he had done his home exercise program as best as he could, but he had not done it as much as prescribed due to the sudden onset of back/scapular pain, as well as personal problems at home. (Tr. at 535.) Sorum noted: "Despite [plaintiff's] admitted limited participation on HEP, he demonstrates further improvement in ASLR and standing toe touch mobility. He requires re-education for his positive prognosis with therapy." (Tr. at 536.)

A September 11, 2017, cervical spine scan revealed straightening of the normal lordotic

15

curvature of the cervical spine; advanced multi-level degenerative disc disease of the cervical spine; and bilateral osseous neural foraminal narrowing. (Tr. at 714-15.)

On September 13, 2017, plaintiff returned to Dr. Hasan, indicating that the pain was tolerable with medications. He denied drowsiness during the day. He indicated he was able to do activities of daily living and minor chores but reported difficulty with walking. (Tr. at 568.) Exam was essentially the same as the last visit. (Tr. at 571.) Dr. Hasan continued medications. (Tr. at 571-72.)

On September 18, 2017, therapist Sorum noted that plaintiff reported problems in his personal life affecting his ability to fully participate in his low back rehab, but he was doing as well as he was able to do with his home exercise program and coming to therapy. (Tr. at 710.) Sorum stated: "Mr. Harris is making fair progress in therapy. Due to chronicity of low back condition, he requires continued education including pain neuroscience education and inherent structural integrity of his lower back, and graded activity to improve his functional level and pain." (Tr. at 711.)

On October 11, 2017, plaintiff saw a physician's assistant at the Center for Pain Management, reporting the pain was tolerable on his current medication regimen. He was able to take care of his activities of daily living, did stretches daily in the morning, and did exercises he learned from PT at night. (Tr. at 761.) On exam, he had normal gait and moved all extremities. He was continued on oxycodone. (Tr. at 763.)

On October 13, 2017, therapist Sorum completed a physical assessment report, indicating that plaintiff's symptoms would often interfere with the attention and concentration required to perform simple work-related tasks, and that he would have to recline or lie down during an eight-hour workday in excess of typical breaks. Sorum further opined that plaintiff

16

could walk four blocks without rest or significant pain, and could sit for four hours and stand/walk for two hours in a eight-hour workday. Sorum indicated that plaintiff could occasionally lift up to 20 pounds and use his arms for reaching 25% of the workday. (Tr. at 579.) Finally, Sorum opined that plaintiff would be absent from work more than four times per month due to his impairments. Sorum concluded: "[Plaintiff] suffers from legitimate lumbar spine dysfunction that is highly related to physical deconditioning, maladaptive coping beliefs and behaviors and long-term opioid medication use. He would likely benefit from multidisciplinary pain rehabilitation center for return to work program." (Tr. at 580.)

On November 8, 2017, plaintiff saw a physician's assistant at the Center for Pain Management, again reporting the pain was tolerable on his current medication regimen. He was able to take care of his daily activities, did stretches daily in the morning, and did exercises he learned from PT at night. (Tr. at 767.) On exam, he had normal gait and moved all extremities. He was again continued on oxycodone. (Tr. at 769.)

On November 16, 2017, plaintiff saw Dr. Okusanya for a sore throat and upper respiratory infection. (Tr. at 708.) On December 8, Dr. Hasan discharged plaintiff due to an insurance issue. (Tr. at 771.) On December 14, plaintiff saw Dr. Okusanya for a cough, also seeking referral to a new pain management doctor because his current provider no longer took his insurance. (Tr. at 706.)

On February 19, 2018, plaintiff commenced treatment with Dr. David Stein at Milwaukee Pain Treatment Services. (Tr. at 591.) On exam, Dr. Stein noted pain with neck rotation (Tr. at 592), antalgic gait, negative straight leg raising, pain with lumbar flexion and extension, negative for knee pain, intact reflexes, normal motor strength, and intact sensation (Tr. at 593). Dr. Stein recommended obtaining a lumbar MRI and continued opioid management. (Tr. at

17

593.)

On March 1, 2018, plaintiff commenced another course of physical therapy at Alliant, reporting neck and back pain dating back to 1998. He indicated that motor vehicle accidents in 2014 and 2015 flared up the pain levels even more. He reported difficulty with activities of daily living, child care, and household chores. (Tr. at 619.) The therapist noted limited cervical and lumbar range of motion with pain, as well as reduced strength. (Tr. at 619-20.) Plaintiff discharged from therapy on June 19, 2018, having attended 11 sessions and missing seven. (Tr. at 658.) The discharge note indicated that he demonstrated progress towards therapy goals. (Tr. at 659.)

On March 20, 2018, plaintiff returned to Dr. Stein, with exam again revealing antalgic gait, negative straight leg raising, reduced lumbar and cervical spine range of motion, and unchanged sensory and motor examination. Dr. Stein continued medications, discussed other options such as injections, and recommended physical therapy for lower back pain. (Tr. at 589.)

On April 17, 2018, Dr. Stein noted the same exam findings, continued opioid management (oxycodone and morphine), and recommended a psychological consult. (Tr. at 588.) On May 10, plaintiff reported that the morphine caused dizziness and sedation. Dr. Stein recorded the same exam findings and continued oxycodone. (Tr. at 587.) On June 11, Dr. Stein again noted the same exam findings, continuing plaintiff on oxycodone and Gabapentin.[7] (Tr. at 586.) On July 9, plaintiff reported not taking the Gabapentin. Exam findings were the

---

[7]On June 30, 2018, plaintiff was seen in the emergency room with a migraine headache. (Tr. at 603, 606.) He was given IV fluids and pain medication. (Tr. at 608.) His pain improved, and he was discharged home. (Tr. at 608-09.)

18

same. (Tr. at 585.) Dr. Stein made the same findings and continued medications on August 1 (Tr. at 584) and August 29 (Tr at 583).

On August 3, 2018, plaintiff commenced another course of physical therapy at Alliant, reporting low back pain starting over 20 years ago while incarcerated and being beaten by guards. He also reported a motor vehicle accident in 1998, which exacerbated the symptoms. He indicated previous physical therapy helped relieve the symptoms. (Tr. at 661.) He walked with a slow cadence, but normal gait pattern. His lumbar range of motion was limited, lumbar strength was 4+/5, and straight leg raise test was positive on the right. (Tr. at 662.) It was recommended he be seen twice weekly for six weeks. (Tr. at 663.) The records indicate he attended a total of 19 sessions, up to December 18, 2018. (Tr. at 665-93, 720-45.) At the October 9 session, plaintiff reported reduced back pain due to taking his medicine that morning. (Tr. at 693.) "Objective measurements indicate progression of patient toward his goals." (Tr. at 694.) At the October 16 session, he reported: "Took meds in the morning really helps improve his mobility and functioning level." (Tr. at 720.) On October 31, the therapist noted decreased lumbar range of motion and increased antalgic gait. (Tr. at 726.) On November 8, plaintiff reported increased pain due to the weather and from not coming to therapy for a while. (Tr. at 730.) On November 20, he reported increased pain due to family stress. (Tr. at 734.) On December 11, he reported decreased pain, feeling a little better than the last session. (Tr. at 738.) On December 18, he reported decreased pain that day because he got up and worked out, took pain medication, and took a hot shower. (Tr. at 742.)[8]

At follow up visits on September 26, 2018, October 24, 2018, November 16, 2018,

---

[8]In November and December 2018, plaintiff saw Dr. Okusanya for a variety of issues (e.g., a chronic cough) unrelated to his claim for disability benefits. (Tr. at 698-704.)

December 19, 2018, January 16, 2019, and February 13, 2019, Dr. Stein noted antalgic gait, negative straight leg raising, tender points in the lumbar and cervical spines, reduced cervical range of motion, and unchanged sensory and motor exams in the lower extremities. He continued oxycodone and Gabapentin. They also discussed other options, including injections and acupuncture. (Tr. at 748, 749, 757, 758, 797, 798.)

Plaintiff underwent another course of physical therapy at ATI from February 28, 2019, to April 18, 2019. (Tr. at 850-59, 878-86.) At the initial session, the therapist noted decreased lumbar range of motion, decreased muscle strength, and positive straight leg raise and "slump" testing.[9] Plaintiff moved slowly with difficulty with transitions, and moved rigidly when asked to bend. (Tr, at 857.) On March 7, the therapist noted decreased mobility of the lumbar paraspinals and erectors with decreased tolerance for bending. (Tr. at 852.) On March 14, plaintiff reported feeling better; he was sore, but it was a good soreness. The therapist noted plaintiff had good tolerance to the session, with increased tolerance to activity. He continued to have decreased lumbar mobility with difficulty with forward bending and lifting. (Tr. at 851.) At the March 26 session, plaintiff reported feeling good that day. The therapist noted that he demonstrated continued decreased range of motion with extension and decreased hip mobility. He needed to continue physical therapy to address difficulty with walking and standing. (Tr. at 850.) The April 18 note indicated positive straight leg raise testing. (Tr. at 881.) The April 25, 2019, discharge note noted objective improvements in range of motion, joint mobility, and strength, increasing plaintiff's ability to perform various tasks. However, straight leg raise and slump tests were noted to be positive, and strength was 4 or 4+/5 in several areas. (Tr. at

---

[9]The slump test is a variant of the straight leg raise test performed in the seated position. https://pubmed.ncbi.nlm.nih.gov/18391677/ (last visited August 24, 2021).

878.)

At follow up visits on March 21, 2019, and April 17, 2019, Dr. Stein again noted antalgic gait, negative straight leg raising, tender points in the lumbar and cervical spines, reduced cervical range of motion, and unchanged sensory and motor exams in the lower extremities. He continued oxycodone and Gabapentin. (Tr. at 868, 869.)  He also referred plaintiff to a psychologist for a consult regarding depression.  (Tr. at 868.)

On April 25, 2019, plaintiff saw Michael Kula, Psy.D., at the request of Dr. Stein, to evaluate his level of intellectual, cognitive, behavioral, and psychological functioning.  (Tr. at 896.)  On testing, Dr. Kula noted average intellectual ability, some depression and anxiety-related symptomatology (Tr. at 898), and a somewhat negative attitude about his chances for a good treatment response (Tr. at 900).  Dr. Kula suggested plaintiff seek individual therapy and a medication regimen to address his depression and anxiety symptoms.  (Tr. at 900).)

## B.    Procedural History

### 1.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits on February 9, 2017, alleging a disability onset date of April 10, 2016.  (Tr. at 289-302.)  In a disability report, plaintiff indicated that his ability to work was limited by neck, back, knee, and elbow problems.  He reported that he stopped working on December 21, 2015, for other reasons, i.e., he was laid off from his seasonal job.  He indicated that his conditions became severe enough to keep him from working on April 10, 2016.  (Tr. at 330.)  He reported past employment as a laborer at a foundry from 2011 to 2012 and as a sanitation and electrical services worker from 2013 to 2015.  (Tr. at 331.)

In a function report, plaintiff indicated that he was unable to stand or sit for long periods

21

of time, and was in constant pain. (Tr. at 350.) He reported that he was able to cook simple meals and perform household chores with rest breaks. (Tr. at 352.) He indicated that pain limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and concentrate. He reported that he could walk a block or so before needing to stop and rest. (Tr. at 355.) In a physical activities addendum, plaintiff indicated that pain made it difficult to sleep at night, and that he napped for about an hour during the day. He reported spending four to six hours a day in bed. He stated that he could sit, stand, and walk for about 20 minutes, and that in April 2016 his doctor (Dr. Gozon) limited lifting to 10 pounds. (Tr. at 358.)

On May 22, 2017, the agency sent plaintiff for an orthopedic evaluation with Neil Pollack, D.O. Plaintiff reported a chief complaint of chronic left knee and elbow pain, present for years. These areas were frequently stiff and achy, and the pain usually decreased when he applied heat. Plaintiff reported that he had been living with these symptoms up until the last few years when he was involved in a motor vehicle accident. He developed increased neck and back pain for which he had been receiving treatment from Dr. Gozon, including the medications Flexeril and OxyContin. He claimed that he could only walk a few blocks, sit for about an hour, and stand for only a few minutes. He had been out of work from the City of Milwaukee sanitation department for over a year. On exam, his neck rotations and side bending were about 60 degrees, with pain at the ends of neck flexion and extension.[10] His shoulder motions were cautious, but 180 degrees in forward flexion and abduction. His grip strength was 40 pounds on the right and 30 pounds on the left. He had tenderness in the distal attachment of

---

[10]"The cervical spine's range of motion is approximately 80° to 90° of flexion, 70° of extension, 20° to 45° of lateral flexion, and up to 90° of rotation to both sides." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1250253/ (last visited August 24, 2021).

the left triceps with normal elbow motions bilaterally.  His finger motions were normal, and he had normal dexterity with both the left and right hands.  He got up from a sitting position and walked unassisted.  He walked slowly and cautiously but was able to elevate up on his heels and toes.  He had 5/5 strength in his arms and legs.  Lumbar flexion was only about 30 degrees, with extreme muscle guarding.  He only had about 10 degrees of lumbar side bending.[11]  (Tr. at 512.)  Right knee flexion was 100 degrees, left 180 degrees, with tenderness around the left kneecap, but no knee swelling.  (Tr. at 512-13.)  Deep tendon reflexes were +2 in the arms and legs, with no sensory lateralizations.  X-rays of the knees showed minimal arthritic changes and of the left elbow some mild osteophyte formation of the distal end of the radius with no other abnormalities noted.  Dr. Pollack assessed mild left knee and left elbow arthritis, restricted neck and lumbar motion and muscle guarding responses, and chronic pain syndrome.  Dr. Pollack concluded: "[Plaintiff] has experienced chronic pain and has some muscle guarding that is influencing his symptoms.  The orthopedic and neurological responses show no specific evidence of nerve root dysfunction or other major lateralization.  He should have a functional evaluation to determine his full capacity."  (Tr. at 513.)

The agency denied plaintiff's applications initially on June 8, 2017 (Tr. at 77-78, 153), based on the opinion of Mina Khorshidi, M.D., who on review of the medical evidence concluded that plaintiff could perform light work (lifting 20 pounds occasionally and 10 pounds frequently, sitting and standing/walking about six hours in an eight-hour workday), frequently climbing ramps/stairs, occasionally climbing ladders/ropes/scaffolds, and frequently stooping,

---

[11]"Normal lumbar ranges of motion include 60 degrees of flexion, 25 degrees of extension, and 25 degrees of lateral, or side, bending." https://www.livestrong.com/article/257162-normal-human-range-of-motion/ (last visited August 24, 2021).

kneeling, crouching, and crawling (Tr. at 85-86).

Plaintiff requested reconsideration (Tr. at 162), submitting another function report, in which he indicated he was in continuous pain dating back to an accident at the age of 13 in 1976 or 1977 (Tr. at 403). He reported no problems with personal care (Tr. at 404), preparing simple meals at times, and cleaning for himself and doing laundry (Tr. at 405). He shopped in stores every few weeks, for 30 minutes or less. (Tr. at 406.) He checked boxes indicating his conditions limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and concentrate, writing that he could only walk short distances, could not do a lot of stair climbing or squatting/kneeling, and could only sit for short periods. (Tr. at 408.) Finally, he reported injuries from car accidents and/or assaults in 1977, 1982, 1998, 2013, 2014, and 2015. (Tr. at 410.)

On October 25, 2017, the agency denied reconsideration (Tr. at 163), based on the record reviews of Pat Chan, M.D., and Janis Byrd, M.D., who concluded that plaintiff could perform light work, frequently climbing ramps/stairs, occasionally climbing ladders/ropes/scaffolds, and occasionally stooping, kneeling, crouching, and crawling (Tr. at 107-07, 132-33). Plaintiff then requested a hearing before an ALJ. (Tr. at 185.)

**2. Hearing**

On June 24, 2019, plaintiff appeared with counsel for his hearing. The ALJ also summoned a VE. (Tr. at 41.)

**a. Plaintiff**

Plaintiff testified that he was 54 years old, 6'1" tall and 170 pounds, with an HSED and a certificate in culinary arts and construction. (Tr. at 45-47.) He last worked from 2013 to 2015

24

for the City of Milwaukee in the sanitation and electrical services departments. (Tr. at 47-48.) He testified that this job ended after he was involved in a serious auto accident in which he was t-boned by another car.[12] Prior to that, he worked at a foundry. (Tr. at 49.) Plaintiff testified that more recently he attempted to work at a meat processing plant, but it was too much for him. (Tr. at 50.)

The ALJ noticed that plaintiff had a cane at the hearing, and plaintiff indicated that he had been using it for the past six months due to his left knee, which sometimes gave out. He testified that Dr. Okusanya prescribed the cane. (Tr. at 51.) His doctors had not suggested surgery but had provided cortisone shots. (Tr. at 52.)

Plaintiff also testified to problems with his left elbow, lower back, and neck. (Tr. at 52.) He indicated that he had discussed a nerve burning procedure with his doctor but had not received it; he had received injections in his neck, back, and elbow, as well as his knee. (Tr. at 53.) The injections provided relief for just a few days before the pain returned. (Tr. at 53.)

Plaintiff testified that he could stand for approximately 20-30 minutes before needing to sit, could reach overhead so long as it was not too far up, and could reach out in front to pick up an object. (Tr. at 54.) For things on a higher shelf, he asked for help. (Tr. at 64.) He indicated that bending his neck to look up caused pain. (Tr. at 64.) He also indicated that he had limited ability to look to the side and down. (Tr. at 65.) Plaintiff also said that his elbow swelled two or three times per month, creating a numbing sensation down his left arm. (Tr. at 55.)

Plaintiff testified that he had a driver's license and could drive a short distance. (Tr. at

---

[12]As indicated above, in a pre-hearing report plaintiff stated that he was laid off from this seasonal job.

56.)  He further indicated that he was able to cook but took breaks to sit while doing so (Tr. at 57); he was able to clean up after meals, putting leftovers away, wiping off the table, and washing dishes (Tr. at 58).  However, his sister did the laundry and made his bed (Tr. at 58), and his sister or brother did the grocery shopping (Tr. at 59).

Plaintiff testified that on a typical day he got up at 9:00 or 10:00, did some exercises he learned from physical therapy, took a hot bath to relax his muscles, sat and watched the news, and then took a nap.  (Tr. at 60-61.)  He indicated that he could put on socks and shoes.  He testified that his doctors had limited lifting to 10 pounds.  (Tr. at 62.)  He took pain medications, which helped to a certain degree, but made him sleepy.  (Tr. at 62.)

Plaintiff testified that he had a motor vehicle accident in April 2016, after which he went to a rehab doctor to help get back to baseline, but his pain had gotten worse since then.  He had been going to physical therapy for several years, which helped a little bit.  (Tr. at 63.)

### b.    VE

The VE classified plaintiff's past work as garbage collector (unskilled, very heavy as generally performed, heavy as actually performed); construction worker (unskilled, very heavy as generally and actually performed); and foundry worker (unskilled, heavy as generally and actually performed).  (Tr. at 71-72.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience; limited to light work; with occasional stooping, crouching, kneeling, crawling, and climbing ladders, ropes and scaffolds; and frequent balancing and climbing of ramps and stairs.  (Tr. at 72.)  The VE testified that such a person could not do plaintiff's past work but could do other jobs such as garment sorter (230,000 jobs nationally), checker (65,000 jobs), and classifier (557,000 jobs).  (Tr. at 72-73.)  The second hypothetical assumed a person of plaintiff's age, education, and work experience,

26

limited to light work, with no climbing of ladders, ropes, or scaffolds; no kneeling or crawling; occasional crouching and stooping; frequent balancing; occasional climbing of ramps or stairs; occasional rotation, flexion, or extension of the neck; and occasional reaching overhead bilaterally.  The VE testified that such a person could perform the same jobs, in the same numbers.  (Tr. at 73.)

Plaintiff's counsel asked about a limitation to occasional bending or twisting at the waist, and the VE said the positions would still be available.  Adding a sit/stand option, the jobs would still be available but with the numbers cut in half.  (Tr. at 74.)  Finally, the VE testified that employers will tolerate one absence per month (Tr. at 74) and no more than 10% time off task (Tr. at 75).

### 3.    ALJ's Decision

On July 15, 2019, the ALJ issued an unfavorable decision.  (Tr. at 16.)  Before proceeding through the five-step analysis, the ALJ noted that plaintiff had applied for DIB and SSI, and that he remained insured through June 30, 2017.  (Tr. at 21.)

The ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since April 10, 2016, the alleged onset date.  (Tr. at 21.)  At step two, the ALJ found that plaintiff had the following severe impairments: degenerative joint disease of the left knee, degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, and degenerative joint disease of the left elbow.[13]  (Tr. at 21.)

At step three, the ALJ found that none of these impairments met or equaled a Listing. The ALJ specifically considered Listing 1.02 (major dysfunction of a joint) regarding plaintiff's

_____

[13]The ALJ found plaintiff's mental impairments non-severe (Tr. at 22), a finding plaintiff does not challenge in this action.

27

elbow, seeing no evidence that plaintiff was unable to perform fine or gross manipulations, and regarding plaintiff's left knee, seeing no evidence that plaintiff was unable to ambulate effectively. The ALJ also considered Listing 1.04 (spinal disorders), stating:

> Imaging of [plaintiff's] lumbar spine shows some nerve root compression (2F/5-7), but there is no associated motor loss, as [plaintiff] has consistently normal strength and motor function (11F/14; 18F/14, 24, 28, 37). Further, while there is a positive straight leg raise on the right (19F/10), there is no evidence [of] a positive straight leg raise in the seated and supine position, as required by the listing. As noted above, [plaintiff] is able to ambulate effectively. Beyond that, there is no evidence of spinal arachnoiditis in any imaging, operative note or pathology report of tissue biopsy. As such, [plaintiff's] impairments do not meet or equal listing 1.04.

(Tr. at 24.)

Prior to step four, the ALJ determined that plaintiff had the RFC to perform light work, except that he could never kneel, crawl, or climb ladders, ropes or scaffolds; he could occasionally crouch, stoop, and climb ramps or stairs; he could frequently balance; he could have only occasional rotation, flexion, or extension of the neck; and he could occasionally reach overhead bilaterally. In making this finding, the ALJ considered plaintiff's statements regarding his symptoms and limitations, as well as the medical opinion evidence. (Tr. at 24.)

Plaintiff alleged that he was unable to work due to constant pain. He reported that he had suffered back and neck injuries numerous times. He further reported pain in his left elbow and left knee. Plaintiff indicated that he could stand, sit, or walk for only 20-30 minutes at a time, and spent four to six hours per day in bed. He further alleged that in April 2016 he was limited to lifting no more than 10 pounds. He also testified to difficulty reaching overhead due to neck and back pain, and reported difficulty with stair climbing, squatting and kneeling. Finally, he alleged difficulty sleeping due to pain, napping during the day for an hour or so. (Tr. at 25.)

28

The ALJ concluded that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical and other evidence of record. (Tr. at 25.) The ALJ acknowledged that the medical evidence documented a long history of neck and low back pain. A November 2016 MRI of the lumbar spine showed multi-level degenerative disc disease ranging from mild to severe, disc bulges at L3-4 and L4-5 causing mild central canal narrowing and contacting the L3 and L5 nerve roots, and mild to moderate forminal narrowing, most pronounced on the right at L3-4. A September 2017 scan of the cervical spine showed straightening of the normal lordotic curve, multi-level advanced degenerative disc disease, and mild osseous neural foraminal narrowing. While this objective imaging demonstrated the existence of plaintiff's impairments, the ALJ found that the nature and scope of plaintiff's treatment for these impairments did not support a finding that plaintiff was more limited than set forth in the RFC. (Tr. at 25.)

The ALJ then reviewed the treatment records, noting that prior to the alleged onset date plaintiff had undergone physical therapy and trigger point injections, and was taking narcotics for pain management. On or about April 20, 2016, plaintiff was involved in a motor vehicle accident, which exacerbated his chronic neck and low back pain. He did not seek immediate medical treatment, but on May 2, 2016, went to urgent care complaining of neck and back pain. He had tenderness and limited motion of the lumbar spine, was diagnosed with a muscle strain, and was given muscle relaxers and released. On May 10, 2016, he followed up with his physiologist, Dr. Benjamin Gozon, who noted spasms and compromised range of motion. However, all other diagnostic tests, including straight leg raise, were negative, and plaintiff demonstrated full muscle strength with intact sensation and reflexes. He was diagnosed with

cervical and lumbar sprain and treated with physical therapy, muscle relaxers, narcotic pain medication, and two trigger point injections. By February 2017, he reported significant improvement, returning to baseline, although he had mild tenderness in the cervical and lumbar spine as well as mild to moderate limitation in range of motion. (Tr. at 26.)

In June 2017, plaintiff visited his primary care provider complaining of low back pain, aggravated by activity and improved by medication. On exam, he had tenderness and limited motion but a negative straight leg raise and normal motor and sensory exams. In July 2017, plaintiff started pain management care, displaying an antalgic gait, decreased motor function in the bilateral lower extremities, subjective tenderness, and limited range of motion. Treatment consisted of pain medication. Lumbar medial branch blocks were recommended but before they could be performed plaintiff asked for a referral to a new doctor. He also attended three physical therapy sessions for neck pain in July 2017 but abruptly canceled or no-showed for the remaining sessions and was discharged for non-compliance. (Tr. at 26.)

In August 2017, plaintiff started treatment with a new pain management provider, complaining of lower back and neck pain. On examination, he had limited range of motion in the cervical and lumbar spines but normal gait, negative straight leg raise, and could move all extremities. He was given narcotics and referred to physical therapy. He completed several sessions of therapy in late August and early September, reporting that he was not performing his home exercises as recommended due to personal problems. Nevertheless, he was noted to be making fair progress. While he was not formally discharged from therapy until November 2017, his last session was on September 18, 2017. (Tr. at 26.) He continued to follow up with pain management for medication refills, with treatment notes through the end of 2017 indicating that his pain was tolerable with medication and that he could perform his activities of daily

30

living.  (Tr. at 27.)

In February 2018, plaintiff established care at a new pain management clinic, as his former clinic no longer accepted his insurance.  On exam, he had painful range of motion in the neck and lower back and an antalgic gait, but a negative straight leg raise and intact motor strength and sensation.  He was prescribed medications and referred to physical therapy.  (Tr. at 27.)

Plaintiff underwent three additional courses of therapy, starting in March 2018, August 2018, and February 2019.  During therapy, he intermittently complained of subjectively abnormal gait, as well as difficulty with sleep, extended sitting, extended standing, bending, and lifting overhead.  On exam, he generally had tenderness, limited range of motion, and decreased strength in the cervical and lumbar spines.  He also had a positive straight leg raise on two occasions (Tr. at 662, 857) and in February 2019 an impaired gait (Tr. at 857).  Each course of therapy lasted several weeks, after which plaintiff reported decreased pain and improved mobility and strength.  (Tr. at 27.)

While participating in therapy sessions, plaintiff continued to follow up with pain management with relatively unchanged complaints, objective findings, and treatment.  He did report dizziness and sedation from morphine, resulting in an adjustment to his pain medications.  There was no indication of worsening as plaintiff got older, as his examinations and complaints remained unchanged since February 2018.  (Tr. at 27.)

The ALJ accommodated plaintiff's neck and back problems by limiting him to light work, with standing and walking six hours in an eight-hour day, and lifting 10 pounds frequently and 20 pounds occasionally.  He further limited plaintiff to no crawling or climbing ladders, ropes or scaffolds, and occasional stooping, crouching, or climbing ramps or stairs, finding that

greater postural movements could aggravate plaintiff's complaints of pain. To account for the cervical issues, he limited rotation, flexion, or extension of the neck, and overhead reaching. (Tr. at 27.)

The ALJ next discussed plaintiff's knee impairment, noting that x-rays from May 2017 showed minimal arthritic changes. Although plaintiff reported chronic left knee pain, the record showed no treatment for this impairment. He first reported left knee pain in July 2017, during his pain management intake. On examination, he had subjective tenderness but no limitation in motion. (Tr. at 27.) Subsequent physical exams showed no painful range of motion or effusion, but minimally reduced strength in the left knee. (Tr. at 27-28.) The ALJ accommodated the knee impairment with a limitation to light work, with no kneeling or climbing ladders, ropes, or scaffolds, and only occasional climbing of ramps or stairs; the ALJ further limited plaintiff to frequent balancing due to knee pain. He found greater limitations unwarranted given the mild objective imaging, lack of treatment, and minimal abnormalities. (Tr. at 28.)

The ALJ also discussed plaintiff's left elbow impairment, noting that x-rays from May 2017 showed some osteophyte formation. While plaintiff complained of pain, he had not sought treatment for this impairment. In July 2017, when initiating pain management treatment, plaintiff reported chronic left elbow pain for the first time. On exam, he displayed tenderness and moderately decreased range of motion of his left elbow with clicking. Treatment notes indicated that plaintiff's pain medications, used to treat his back and neck, were also used to treat his elbow pain. Later treatment notes showed full range of motion of the left elbow, without complaints of pain. The ALJ considered plaintiff's elbow disorder in restricting him to light work, with limited lifting, finding that greater limitations were not warranted given the lack

32

of treatment history and minimal objective abnormalities. (Tr. at 28.)

The ALJ found that the results of the May 2017 consultative exam did not suggest greater limitations. During the exam, plaintiff displayed limited range of motion in his cervical and lumbar spine, tenderness with normal elbow motions bilaterally and full strength in his upper extremities, and tenderness in the left knee cap with intact sensation and reflexes. He was able to stand from the seated position and walk unassisted, albeit slowly. He could heel walk, toe walk, and had full strength in his lower extremities. While abnormalities were noted, they did not suggest greater functional limitations than set forth in the RFC. (Tr. at 28.)

The ALJ found plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms inconsistent with the objective medical evidence, his conservative treatment history, and his appearance at the hearing. (Tr. at 28-29.) First, the ALJ noted that plaintiff's impairments were chronic and pre-dated the alleged onset date by many years. Despite these chronic impairments, plaintiff was able to work at substantial gainful activity levels. While plaintiff stopped working in late 2015, he did so because his seasonal work ended, not because his chronic impairments had worsened. Plaintiff reported increased pain following his 2016 motor vehicle accident, but he returned to baseline by February 2017, and the record contained no evidence of further exacerbation of his symptoms. To the contrary, his complaints and exams remained unchanged since February 2018. (Tr. at 28.) Accordingly, the ALJ found no medical evidence suggesting that plaintiff's chronic impairments prohibited him from working currently, when he was able to work with the same conditions prior to April 2016. (Tr. at 28-29.)

Second, plaintiff had a relatively conservative treatment history consisting of physical therapy, two injections, and medication management. While treatment notes since February 2018 mentioned the possibility of more aggressive treatment in the future, such as additional

33

injections or radio-frequency ablation, plaintiff's treatment remained unchanged since that time. Plaintiff alleged that he was a surgical candidate, but the treatment records showed no indication for or discussion regarding possible surgery.  (Tr. at 29.)

Third, although plaintiff walked into the hearing with a cane, which he stated he had used since December 2018, the ALJ saw no evidence of need for a cane in the medical records.  Plaintiff testified that Dr. Okusanya, his primary physician, prescribed a cane, but there was no indication of that in his treatment notes.  Moreover, the ALJ noted, plaintiff stood up and held the cane in his hand as he walked out of the hearing room, not using it to ambulate.  (Tr. at 29.)

Fourth, plaintiff alleged that he had a permanent 10-pound lifting restriction, but this allegation was inconsistent with the objective record.  Dr. Gozon limited plaintiff to no "heavy lifting" between May 2017 and January 2017; he did not limit plaintiff to 10 pounds, as alleged. Further, this limitation was not permanent, as in February 2017 Dr. Gozon indicated that plaintiff could return to work without limitation.  Plaintiff also alleged neuropathy in his left arm, but there was no evidence of that in the medical record.  (Tr. at 29.)

Fifth, the ALJ found plaintiff's alleged knee and elbow pain inconsistent with his treatment history.  The ALJ concluded that if the pain was as severe and limiting as alleged, then it was reasonable to believe plaintiff would have sought consistent treatment for this pain. Plaintiff alleged that his knees had given out on him, resulting in falls, but there was no indication of such complaints in the treatment records.  Moreover, plaintiff made no mention of pain or other issues with his elbow in his second function report.  (Tr. at 29.)

Finally, plaintiff reported that he could only sit for a few minutes at a time, but the ALJ found this allegation was also unsupported by the record.  While the treatment notes contained

34

intermittent complaints of difficulty with extended sitting, they lacked any observed or noted difficulty sitting. Plaintiff was also able to sit through the entire hearing, which lasted nearly one hour, without complaint. Moreover, plaintiff did not testify to difficulty sitting, instead stating that sitting was a relieving factor. (Tr. at 30.)

As for the opinion evidence, the ALJ gave great weight to the opinions of the reconsideration level agency medical consultants, who opined that plaintiff could perform light work with frequent balancing and climbing ramps and stairs, and occasionally performing other postural movements. The consultants supported their opinions with specific reference to the objective record, including the imaging of plaintiff's spine, knee, and elbow. Their opinions were also consistent with the overall objective record, including plaintiff's improvement with treatment, his mostly normal gait, and his relatively conservative treatment. Considering the entire record, and listening to plaintiff's testimony, the ALJ found that plaintiff required greater postural limitations, as well as limitations in neck rotation and overhead reaching. (Tr. at 30.)

The ALJ gave some weight to the opinion of the initial level agency consultant, Dr. Khorshidi, who opined that plaintiff could perform light work with unlimited balancing, occasionally climbing ladders, ropes and scaffolds, and frequently performing other postural movements. Dr. Khorshidi supported her opinion with reference to the record as it existed at the time, although she did not have access to the extensive medical evidence received at later levels of review. While Dr. Khorshidi's opinion that plaintiff could perform light work was consistent with such evidence, her postural limitations were inconsistent with the later evidence showing ongoing complaints of pain and limited range of motion. (Tr. at 30.)

The ALJ:

further considered the Physical Assessment completed by Nathaneal Sorum,

35

DPT, who in October 2017 opined that [plaintiff] could perform less than sedentary work, as he could only sit for four hours and stand/walk for two hours in an eight hour workday. Mr. Sorum further opined that [plaintiff] could only reach 25% of the time bilaterally and would be absent more than four times per month. Mr. Sorum fails to support his opinions, particularly those related to [plaintiff's] arms and absences, with any objective findings whatsoever. Such limitations are further inconsistent with Mr. Sorum's treatment records, which show a limited range of motion in the lumbar spine, without cervical involvement, as well as with the other objective evidence, as set forth above. Mr. Sorum is not an acceptable medical source under Agency guidelines. He treated [plaintiff] for less than one month, and therefore is not well suited to provide an opinion as to [plaintiff's] longitudinal functioning. As such, I give his opinion little to no weight.

(Tr. at 30-31, internal record citations omitted).

Finally, the ALJ considered the various opinions from Dr. Gozon, who from May 2016 through January 2017 opined that plaintiff should not perform heavy lifting and temporarily be off work. Dr. Gozon failed to identify the functional limitations prohibiting plaintiff from working, beyond heavy lifting. While Dr. Gozon did not specify a precise weight plaintiff was prohibited from lifting, nothing indicated that light work (lifting no more than 20 pounds) would be excluded. Additionally, Dr. Gozon's limitations did not last for 12 months, as by February 2017 he released plaintiff from treatment without any restrictions. As such, the ALJ gave Dr. Gozon's opinions little weight. (Tr. at 31.)

Based on this RFC, the ALJ determined at step four that plaintiff could not perform his past work as a garbage collector, construction worker, and foundry worker, heavy or very heavy jobs. (Tr. at 31.) At step five, the ALJ first considered the Grids, noting that plaintiff was 51 years old, an individual closely approaching advanced age, on the alleged onset date. (Tr. at 31.) As of the date last insured, June 30, 2017, he was 52, still an individual closely approaching advanced age. Because plaintiff was not within a few months of the next higher age category at that time, a borderline age situation did not exist with regard to the DIB claim.

36

(Tr. at 32.)

With respect to the SSI application, however, a borderline age situation did exist because plaintiff was as of the date of decision within two months of turning 55, which would place him in the advanced age category and would result in a finding of disabled given the light RFC. However, the ALJ concluded that:

> use of this age category is not supported by the limited adverse impact of all factors on [plaintiff's] ability to adjust to other work.
>
> The overall impact of [plaintiff's RFC], combined with his age, education and work experience, does not support use of the higher age category. After review of the entire record, and considering the potential adverse impact of all factors on [plaintiff's] ability to adjust to other work, I find that the use of the next higher age category is not supported.
>
> [Plaintiff] is within two months of turning age 55, which would place him the advanced age category. [Plaintiff's] impairments are chronic, dating back to the 1970s. (11E). The medical evidence does not show a sharp worsening of [plaintiff's] impairments, which fails to suggest that [plaintiff] would be more limited under the criteria of grid rule 202.04. Therefore, [plaintiff's RFC] has less impact on his ability to adjust to other work.
>
> The record shows that [plaintiff] has more than just a high school education, as he also underwent specialized construction job training as well as culinary arts training (1E/3, hearing testimony). [Plaintiff] reports using his technical knowledge and skills through April 2007 (6E/6). These factors do not indicate that [plaintiff's] education is more adverse under the criteria of grid rule 202.04.
>
> [Plaintiff] has a long work history, past relevant work that ended in the recent past, and past relevant work that exists in many areas and uses common processes (3E, 17E). The extensive limitations in the above [RFC] already substantially erode the occupational base. Considering this factor would double weigh the same. Therefore, [plaintiff's] work history is not relatively more adverse under the criteria of rule 202.04. The record documents no additional element(s) that would seriously affect the ability to adjust to other work.
>
> Applying the sliding scale approach, I find that [plaintiff's RFC], age, education and work experience fail to show an adverse impact on the ability to adjust to other work, and thus that the application of the higher age category is not supported.

37

(Tr. at 32.)

The ALJ noted that, if plaintiff had the RFC to perform a full range of light work, a finding of not disabled would be directed under Rule 202.13. However, given the existence of additional limitations, the ALJ asked the VE whether jobs existed plaintiff could perform, and the VE identified garment sorter, checker, and classifier. (Tr. at 33.) The ALJ accepted this testimony and found plaintiff not disabled at step five. (Tr. at 33-34.)

On May 4, 2020, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on plaintiff's application. See Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019). This action followed.

## III. DISCUSSION

### A.     Listing 1.04

Plaintiff primarily argues that the ALJ erred in evaluating Listing 1.04. (Pl.'s Br. at 11-16; Pl.'s Rep. Br. at 1-4.) "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015) (internal quote marks omitted). However, "a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing." Knox v. Astrue, 327 Fed. Appx. 652, 655 (7th Cir. 2009). "An ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing." Alesia v. Astrue, 789 F. Supp. 2d 921, 932 (N.D. Ill. 2011).

To satisfy Listing 1.04, a claimant must establish: (A) a disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative

38

disc disease, facet arthritis, vertebral fracture); (B) resulting in compromise of a nerve root or the spinal cord; (C) with evidence of nerve root compression characterized by (i) neuro-anatomic distribution of pain, (ii) limitation of motion of the spine, (iii) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and (iv) if there is involvement of the lower back positive straight-leg raising test (sitting and supine). 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04 (2021); Zellweger v. Saul, 984 F.3d 1251, 1254 (7th Cir. 2021).

As indicated above, in the present case the ALJ acknowledged the evidence of nerve root compression (Tr. at 24, citing Tr. at 461-63) but found that there was no associated motor loss, as plaintiff had consistently normal strength and motor function. (Tr. at 24, citing Tr. at 607, 817, 827, 831, 840.) The ALJ further noted that while there was a positive straight leg raise on the right (Tr. at 24, citing Tr. at 857), there was no evidence of a positive straight leg raise in the seated and supine position, as required.

In discussing plaintiff's strength and motor function, the ALJ cited records from an ER visit for a migraine (Tr. at 607) and from plaintiff's visits to his primary care physician, most of which related to other problems, e.g., a cough/cold (Tr. at 816-17), fatigue/chest pain (Tr. at 830-31), and penile discharge (Tr. at 839-40). The ALJ overlooked evidence of reduced strength (motor loss) documented by plaintiff's pain management specialist, Dr. Sharma, in July 2017 (Tr. at 521) and by his physical therapists in August 2017 (Tr. at 548), March 2018 (Tr. at 620), and February 2019 (Tr. at 857). Even after completing his final course of therapy in April 2019, demonstrating improvement, plaintiff still displayed 4/5 and 4+/5 strength in certain areas. (Tr. at 878.) The ALJ also overlooked the positive bilateral straight leg raise tests and

39

positive "slump" test completed by a physical therapist in February 2019.[14] (Tr. at 857.) A slump test is a seated variant of the straight leg raise test, and the therapist contemporaneously noted reduced motor strength (Tr. at 857), with these findings continuing over the two-month course of treatment (Tr. at 878-79). While the ALJ generally noted this course of physical therapy, he failed to acknowledge these pertinent findings. (See Tr. at 27.) The ALJ further overlooked the reference in Dr. Sharma's notes to diminished sensation to light touch. (Tr. at 521.) While the ALJ is not required to discuss every piece of evidence, he may not select only facts from the record that support his conclusion, while disregarding facts that undermine it. Scrogham v. Colvin, 765 F.3d 685, 699 (7th Cir. 2014).

The Commissioner appeals the rule that an ALJ's decision must be read as a whole, see Zellweger, 984 F.3d at 1254; Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004), noting that the ALJ discussed plaintiff's back impairment in more detail in the RFC section. (Def.'s Br. at 8.) In that portion of the decision, the ALJ cited Dr. Gozon's May 2016 findings of negative straight leg raise and full muscle strength with intact sensation and reflexes (Tr. at 26, citing Tr. at 485); normal straight leg raise tests and motor/sensory exams in 2017 (Tr. at 26, citing Tr. at 565, 827); and mixed findings in 2018 and 2019, with both negative and positive straight leg raise tests, and some decreased strength but also intact motor strength and sensation (Tr. at 27, citing Tr. at 593, 662, 857). The Commissioner concludes that the ALJ's decision was appropriate because the majority of the evidence did not show motor loss accompanied by sensory or reflex loss, and the majority of the straight leg raise tests were negative. (Def.'s Br. at 8.)

---

[14]Plaintiff mistakenly indicates this test was conducted in February 2018, rather than February 2019. (Pl.'s Br. at 13.)

The problem with this argument is that it diverges from the ALJ's findings at step three, where the ALJ found "<u>no</u> associated motor loss" and "<u>no</u> evidence [of] a positive straight leg raise in the seated and supine position." (Tr. at 24.) In other words, this is not a case in which the ALJ weighed the conflicting evidence and then found by a preponderance of the evidence that the claimant failed to prove his Listing claim. <u>See</u> 20 C.F.R. § 404.953(a) ("The administrative law judge must base the decision on the preponderance of the evidence offered at the hearing or otherwise included in the record."). Rather, he concluded that the required evidence was absent. As discussed above, there is evidence in the record of a positive seated straight leg raise test, which the ALJ never mentioned. And, while the ALJ later cited some of the evidence of abnormal motor strength, it is hard to see how that discussion supports the Commissioner's argument that the step three finding should be upheld because a majority of the evidence showed no motor loss. Essentially, the Commissioner seeks to rewrite the step three finding to state there is not <u>enough</u> evidence of motor loss (as opposed to <u>no</u> evidence of motor loss), and that the required straight leg raise evidence was <u>inconsistent</u> (as opposed to <u>incomplete</u>). <u>See</u> <u>Steele v. Barnhart</u>, 290 F.3d 936, 941 (7th Cir. 2002) ("[T]he ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion.") (internal citations and quote marks omitted); <u>Fulfer v. Astrue</u>, 917 F. Supp. 2d 883, 887 n.2 (E.D. Wis. 2013) ("The principle of <u>Rice</u> is that ALJs need not duplicatively re-state the evidence before them; it is not that ALJs can set forth a shotgun blast of evidence without adequate analysis in hopes that the reviewing Court will gather the scattered pellets into some semblance of analytic thought.").

The Commissioner also relies on the agency consultants' opinions in defending this claim. (Def.'s Br. at 8, citing <u>Massaglia v. Saul</u>, 805 Fed. Appx. 406, 409-10 (7th Cir. 2020)

41

("Opinions of state-agency consultants may constitute substantial evidence on the issue of whether a claimant's impairments meet a presumptive disability listing.") (citing Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004).)  The Commissioner notes that the three reviewing physicians considered Listing 1.04, and none of them found it met.  (Tr. at 84, 105, 130.)  No other medical source opined that the Listing was met.  (Def.'s Br. at 9.)

The problem with this argument is that the ALJ did not cite those opinions at step three.  While he did credit the consultants, in part, in determining RFC, that cannot salvage the step three finding.  The consultants mentioned Listing 1.04, but their reports contain no analysis or findings regarding any of its criteria.  Thus, while an "ALJ may properly rely upon the opinion of these medical experts," Scheck, 357 F.3d at 700, in this case there was no such reliance and, in any event, nothing in those reports fills in the gaps in the ALJ's analysis of the Listings.

Finally, the Commissioner argues that, even where an ALJ's Listing discussion is insufficient, to obtain remand the claimant must still provide evidence that his impairment satisfies all of the Listing's criteria.  (Def.'s Br. at 9, citing Sosinski v. Saul, 811 Fed. Appx. 380, 381 (7th Cir. 2020) ("But even if the ALJ does not offer such an analysis, we do not reverse if the claimant fails to show that he meets the criteria for that listing, as Sosinski did here."); Knox, 327 Fed. Appx. at 655 ("Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing.").)  The Commissioner then proceeds to argue that plaintiff fails to connect the evidence of reduced motor strength to any sensory or reflex loss, as required by the Listing.  The Commissioner notes that plaintiff cites no evidence of impaired reflexes and just one exam showing diminished sensation to light touch, an isolated finding that does not render the ALJ's conclusion unsupported.  The Commissioner further contends that the

42

findings of positive straight leg raise tests are similarly isolated and inconsistent with prior negative tests. (Def.'s Br. at 10, citing Jeske, 955 F.3d at 591 (rejecting Listing claim where the record showed inconsistent straight leg raise tests and the evidence was mixed regarding motor strength loss).) And, the Commissioner contends, plaintiff's evidence is insufficient because it does not satisfy the duration requirement, as it was sporadic and at times concurrent with normal findings. (Def.'s Br. at 10, citing Densow v. Saul, No. 19-C-136, 2020 WL 459020, at *4 (E.D. Wis. May 22, 2020) ("It is not enough to show that at some point in time the claimant met each of the criteria of a specific Listing."), aff'd, 2021 WL 2396239 (7th Cir. June 11, 2021).) The Commissioner concludes that because plaintiff "has not met his burden of providing this Court with conclusive evidence that his degenerative disc disease was presumptively disabling" remand is not warranted. (Def.'s Br. at 10-11.)

The Commissioner overstates plaintiff's burden here. Plaintiff is not seeking a judicial award of benefits, which is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). Rather, he is seeking a remand for further proceedings so that the ALJ may consider evidence he appears to have overlooked. While the court need not remand on a Listing claim unless the claimant has presented substantial evidence touching on each of the criteria, there is no requirement that he conclusively establish disability. Nor is it consistent with the role of a reviewing court to weigh conflicting evidence itself. As the Seventh Circuit stated in Spiva v. Astrue:

> The government seems to think that if it can find enough evidence in the record to establish that the administrative law judge might have reached the same result had she considered all the evidence and evaluated it as the government's brief

43

> does, it is a case of harmless error. But the fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion.

628 F.3d 346, 353 (7th Cir. 2010). The matter must be remanded for reconsideration of the Listing claim.

## B.    Therapist Sorum's Opinion

Plaintiff argues that the ALJ erred in discounting the report from physical therapist Sorum. If accepted, that report would have required a disability finding, as the VE testified employers tolerate no more than one absence per month, whereas Sorum predicted more than four per month. (Pl.'s Br. at 17, 20.)

Physical therapists are not under the regulations applicable to this case considered "acceptable medical sources" for purposes of establishing the existence of an impairment, but their "evidence may be used to show the severity of an impairment and how it affects a claimant's ability to function." Thomas v. Colvin, 826 F.3d 953, 961 (7th Cir. 2016) (citing SSR 06-03p). In evaluating the opinion from such a source, the ALJ should consider how long the source has known and how frequently the source has seen the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support the opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the claimant's impairment (s), and any other factors that tend to support or refute the opinion. SSR 06-03p, 2006 SSR LEXIS 5, at *11 (rescinded effective Mar. 27, 2017); see also Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014) ("An ALJ may consider a chiropractor's opinions, of course, but the weight they will be given will depend on a number of factors, including the degree to which they are supported by objective

44

evidence.").

As indicated above, in the present case the ALJ gave Sorum's report little to no weight. The ALJ gave several reasons: (1) Sorum failed to support his opinions, particularly those related to plaintiff's arms and absences, with objective findings; (2) those limitations were inconsistent with Sorum's treatment records, which showed a limited range of motion in the lumbar spine but without cervical involvement, as well as with the other objective evidence; (3) Sorum is not an acceptable medical source under the regulations; and (4) Sorum treated plaintiff for less than one month. (Tr. at 30-31.)

Plaintiff contends that Sorum <u>did</u> explain why he found significant limitations, stating that plaintiff "suffers from legitimate lumbar spine dysfunction that is highly related to physical deconditioning, maladaptive coping beliefs and behaviors and long-term opioid medication use." (Tr. at 580.) However, plaintiff fails to explain how this vague statement supports significant limitations on use of the arms or the level of absenteeism Sorum predicted. (<u>See</u> Pl.'s Br. at 17-18.) Plaintiff also contends that Sorum's treatment records provide the necessary support, noting that Sorum's exams revealed reduced range of motion, reduced strength, and tenderness. Again, however, plaintiff fails to explain how these findings support arm restrictions or expected absences. (<u>See</u> Pl.'s Br. at 18.) Plaintiff further argues that Sorum prepared the report after treating him on a regular basis, conducting six therapy sessions. But as the ALJ correctly noted, those sessions occurred over less than one month (Tr. at 548, 711), and plaintiff fails to explain how this brief treatment period gave Sorum "the best picture" of plaintiff's medical condition. (<u>See</u> Pl.'s Br. at 19.)

Plaintiff argues that it was unfair of the ALJ to discount Sorum's report based infrequency of examination while also giving great weight to the opinions of the agency

45

consultants, who never examined him and lacked access to the complete medical record. (Pl.'s Br. at 19-20.)  But the ALJ explained that, unlike Sorum, the consultants supported their opinions with specific references to the objective evidence, and their opinions were consistent with the overall record, including plaintiff's improvement with treatment, his mostly normal gait, and his relatively conservative treatment.  (Tr. at 30.)  As the Commissioner notes (Def.'s Br. at 15), it is also hard to accept plaintiff's argument the consultants' opinions, offered on October 2, 2017 (Tr. at 119) and October 25, 2017 (Tr. at 129), are stale when Sorum's report was offered that same month, on October 13, 2017.  (Tr. at 580.)  Moreover, plaintiff points to no new diagnoses or significant diagnostic reports postdating the reconsideration level consultants' opinions.  Cf. Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018) ("An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion."), amended on reh'g, 2018 U.S. App. LEXIS 9296 (7th Cir. Apr. 13, 2018); Stage v. Colvin, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment"); Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014) (remanding after ALJ failed to submit new MRI to medical scrutiny). Nor does plaintiff acknowledge that the ALJ included additional postural, neck rotation, and reaching limitations based on the later evidence and the hearing testimony.  (Tr. at 30.)

Ultimately, it is not the role of the reviewing court to re-weigh the evidence or replace the ALJ's judgment with its own.  Jeske, 955 F.3d at 587.  Here, the ALJ's analysis tracked the regulatory factors, and his findings are supported by substantial evidence.  That the evidence could have also supported a different conclusion provides no basis for remand.  See Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) ("Where substantial evidence supports the ALJ's

46

disability determination, we must affirm the decision even if reasonable minds could differ concerning whether [the claimant] is disabled.") (internal quote marks omitted).

## C.    Borderline Age Situation

Plaintiff argues that the ALJ's errors in determining RFC led to an improper conclusion on the borderline age situation.  The ALJ reasoned that the RFC assessment, coupled with plaintiff's education and vocational history, did not direct him to consider plaintiff as of advanced age, even though he was less than two months from turning 55.  Plaintiff contends that the ALJ's improper omission of much evidence from his opinion, plus his improper weighing of the medical opinions, calls into question his borderline age analysis.  (Pl.'s Br. at 21.)

As indicated above, the ALJ provided a detailed, seven-paragraph discussion of this issue.  Plaintiff develops no independent argument that the ALJ failed to conduct a proper borderline age analysis.  See Vang v. Saul, 805 Fed. Appx. 398, 403 (7th Cir. 2020) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") (internal quote marks omitted).  As the Commissioner notes, the ALJ's analysis tracked the factors set forth in the agency's guidance.  (Def.'s Br. at 18, citing the HALLEX and POMS.)  Plaintiff makes no argument that the ALJ failed to consider the appropriate factors or included any improper ones.  On remand, the ALJ may after considering the additional evidence referenced above decide to revisit this issue, but it provides no separate basis for remand.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is

remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of August, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge